**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **DENNIS J. CONNOLLY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 1:06cv179** |
| | ) | |
| **THE MILLS CORPORATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**MEMORANDUM OPINION**

This age discrimination case presents a threshold question concerning the timeliness of plaintiff's administrative charge alleging discriminatory termination. Defendant claims that plaintiff's EEOC charge was not timely filed because it was not filed until 1150 days—more than three years—after defendant first notified plaintiff he would be terminated. Plaintiff disagrees, contending that defendant never provided final and unequivocal notice of termination and hence his EEOC charge was timely filed well within the 300-day limitation period. This case thus presents yet another variant—albeit a somewhat novel one—on the question of what constitutes a valid final and unequivocal notice of termination.

**I.[1]**

In May 1998, defendant The Mills Corporation ("Mills"), a real estate development

---

[1]As the parties appropriately agree, because this case is pending on a motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., the facts recited here are derived from the plaintiff's complaint. *See, e.g.*, *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994) (plaintiff's version of facts is accepted as true on motion to dismiss).

1

corporation, hired now 64 year-old Dennis Connolly ("Connolly") as a Vice President and Senior

Development Director.  In November 1998, Mills tapped Connolly to lead the development

management of Arundel Mills Mall, a $260 million project in Anne Arundel County, Maryland.

Arundel Mills Mall opened in November 2000 to rave reviews.  After primary work on the

Arundel Mills Mall project concluded, Connolly was asked to lead the development management

of Discover Mills Mall, a $270 million project in Gwinnett County, Georgia.  Like Arundel Mills

Mall, Discover Mills Mall was also a success.  Work on the Discovery Mills Mall project

concluded in November 2001.  Connolly's strong performance on these and other projects earned

him high performance evaluations from Mills.  Moreover, from 1999 on Mills rewarded

Connolly with annual salary increases, stock options, and annual bonuses that met or exceeded

the bonus amount for which he was eligible.

Connolly's direct supervisor at Mills was Terry Fitzgerald, Mills' Executive Vice

President for Development.  Because of Connolly's outstanding track record, Fitzgerald informed

Connolly in July 2002 that he was presenting a proposal to Mills' Executive Committee

recommending that Connolly be promoted to be Fitzgerald's "number two" in a new

development department Fitzgerald would be leading.  On or about September 6, 2002, however,

Fitzgerald informed Connolly that Mills' executive committee had rejected Fitzgerald's proposed

management plan, and that Connolly instead would be terminated.  During this meeting,

Connolly repeatedly asked Fitzgerald what went wrong, and who had made the decision to reject

Connolly's promotion, but Fitzgerald did not answer him.  Connolly claims that Fitzgerald told

him during this meeting that he believed that Connolly would be offered "a package," and

suggested that Connolly might be able to continue as a consultant.

In mid-September 2002, Connolly asked Fitzgerald "if there was anything he could do or improve upon in order to change the course of the events predicted by Fitzgerald." Fitzgerald responded that there was nothing Connolly could do in this regard. On November 1, 2002, Fitzgerald informed Connolly that he would like Connolly to complete the transition from employee to consultant by the end of 2002, and asked Connolly to decide by the end of November whether Connolly wished to continue as a non-employee consultant. The week after this conversation, Connolly informed Fitzgerald that he would agree to continue as a consultant. On December 23, 2002, Connolly received a draft of his consulting agreement from Mike Rodis, Mills' Senior Vice President for Human Resources. Connolly returned his comments on this draft agreement to Rodis on December 27, 2002, and expressed his concern that the parties were in danger of missing the December 31 deadline. In response to Connolly's concern, Rodis replied that the December 31 date was "not magic" and that if the consulting contract were not done by then "no one was going to pull the trigger."

In fact, no consulting contract was in place, either orally or in writing, at the end of December 2002. Nonetheless, Mills terminated Connolly's employment and benefits effective December 31, 2002. When Connolly discovered that his benefits had been cancelled on January 13, 2003, he promptly called Fitzgerald to complain. In response, Fitzgerald ordered all of Connolly's benefits restored. Two days later, on January 15, 2003, Connolly learned from Mills' benefits department that he had been terminated effective December 31, 2002. Connolly then protested his termination to James Dausch, Mills' Senior Executive Vice President, and Dausch ordered Connolly reinstated as an employee until his consulting contract was finalized. In the end, all of Connolly's salary and employee benefits were reinstated retroactively to December 31,

3

2002.

Thereafter, Connolly received another draft consulting contract from Rodis on March 1, 2003, and Rodis suggested that they aim to have a final contract in place by March 31, 2003. Connolly returned his comments on this latest draft to Rodis on March 15, 2003, at which time Rodis stated that the target date of March 31 was "not magic", and that it might make more sense to finalize the agreement after April 15, the date scheduled for the distribution of bonuses. On April 15, 2003, Connolly received his full employee bonus and a 4.7% salary increase. No consulting agreement had been finalized by that time.

From April until August 2003, Connolly worked full time as a Mills employee on a project in Cincinatti. On August 18, 2003, Fitzgerald asked Connolly if Rodis had gotten back to him on the consulting contract. Connolly replied that Rodis had not, and Fitzgerald said that Connolly "would probably keep working (as an employee) until there was no more work available." In December 2003, Fitzgerald told Connolly "that there was enough work in the pipeline to keep Connolly busy (and employed) for at least the next two years." From January 2004 to August 2004, Connolly continued to work on the Cincinatti project. On April 15, 2004, Connolly again received his full employee bonus and a 4.7% salary increase.

Primary work on the Cincinatti project was completed in August 2004. At the grand opening of the Cincinatti project, Connolly was singled out for praise by both Mills' Chairman, Larry Siegel, and a Board Member, Jim Braithwaithe. From September 2004 to January 2005, Connolly continued to do finishing work on the Cincinatti project while awaiting a new permanent project assignment.

On February 10, 2005, Fitzgerald told Connolly that the "same BS" that had occurred two

4

years ago was happening again, and that Mills had decided that Connolly was not "appropriate" to work on Mills' three new projects.  But, Fitzgerald also stated that Mills would not make a final determination whether Connolly would be eligible to work on Mills' three new projects until after bonus time—April 15, 2005.  At Fitzgerald's urging, Connolly met with Dausch to find out what was happening.  Dausch told Connolly that Connolly "had done a fine job for the company and no doubt would continue to do a fine job; however, this decision (to terminate Connolly) was being made 'way above him.'"  Dausch recommended that Connolly speak with another senior level Mills employee, Bob Ferguson, who had expressed interest in hiring Connolly as a consultant on some of his projects.  Connolly did so, and Ferguson acknowledged that he would be interested in using Connolly on at least three of his upcoming projects.

Until October 2005, Connolly continued to work as a Mills employee on both the Cincinatti and the Arundel Mills Mall projects on which he had previously worked.  On November 15, 2005, Connolly learned that Mills had terminated him, effective that day.  At the time of his termination, Connolly was 63 years old.  No consulting agreement between Mills and Connolly was ever finalized or offered to Connolly.  On or about November 22, 2005, Connolly filed his administrative charge of age discrimination with the EEOC, alleging that Mills has unlawfully terminated him on account of his age.

Mills argues that Connolly's complaint makes clear that he received final and unequivocal notice that Mills intended to terminate him in September 2002, January 2003, and August 2003.  Any of these notifications, Mills argues, was sufficient to trigger the running of the limitations period, thereby rendering Connolly's November 2005 EEOC charge untimely.  The issue, then, is whether any of these instances qualifies as "final and unequivocal" notice that

Mills would terminate Connolly.[2]

## II.

The ADEA makes clear that a plaintiff must first file a claim with the EEOC as a prerequisite to filing a claim of age discrimination. *See* 29 U.S.C. § 626(d)(1) (requiring filing of an administrative charge with EEOC). Because Virginia is a deferral state, victims of discrimination in Virginia have 300 days to file a claim with the EEOC.[3] This 300-day period begins to run "from the time at which the employee is informed of the allegedly discriminatory employment decision, regardless of when the effects of that decision come to fruition." *Price v. Litton Business Systems, Inc.*, 694 F.2d 963, 965 (4th Cir. 1982) (citing *Delaware State College v. Ricks*, 449 U.S. 250 (1980) (same).[4] But importantly, the limitation period does not begin to run until the employee receives "final and unequivocal" notice of the adverse employment decision in issue. *English v. Whitfield*, 858 F.2d 957, 961 (4th Cir. 1988). Put differently, an

---

[2]Connolly asserts two causes of action in his complaint. Specifically, he alleges (i) that Mills violated the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 *et seq.* when it unlawfully discharged him on the basis of his age; and (ii) that Mills violated the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1001 *et seq.* by failing to give him notice of his COBRA rights. Mills filed a motion to dismiss Connolly's ADEA claim pursuant to Rule 12(b)(6), Fed. R. Civ. P., on the ground that Connolly's administrative charge of age discrimination was untimely. Connolly's COBRA claim is not at issue here.

[3]*See Tinsley v. First Union National Bank*, 155 F.3d 435, 442 (4th Cir. 1998) ("discrimination claims filed in Virginia are subject to the 300-day period of limitations"); *Lewis v. Norfolk Southern Corp.*, 271 F.Supp.2d 807, 811 (E.D. Va. 2003) ("As a prerequisite to filing a civil action charging age discrimination, an aggrieved party must first file a charge with the EEOC. In a 'deferral' state like Virginia, this charge must be filed no later than 300 days 'after the alleged unlawful practice occurred.'").

[4]*See also Chardon v. Fernandez*, 454 U.S. 6, 8 (1981) ("[T]he proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful.").

employee must know "with certainty" that the adverse employment action will occur.  *Lendo v.*

*Garrett County Board of Education*, 820 F.2d 1365, 1367 (4th Cir. 1987).[5]

Mills argues that it gave Connolly final and unequivocal notice that it intended to

terminate him on three occasions: September 2002, January 2003, and August 2003.  Because

each of these notices occurred more than 300 days before Connolly filed his EEOC charge,

Connolly's EEOC charge will be untimely if any of them is sufficient to trigger the limitations

period.  Accordingly, each notice is separately addressed.

With respect to the first notice in issue, there is no doubt that Connolly received final and

unequivocal notice in September 2002 that he would be terminated at the end of the year.  In this

regard, Fitzgerald's statement to Connolly that there was nothing Connolly could do to alter

Mills' plan to terminate him clearly communicated to Connolly that Mills had decided at that

time to terminate him.  Subsequent conversations confirmed that Mills would terminate

Connolly's employment on December 31, 2002, and that Connolly would continue thereafter as a

consultant.  Indeed, Mills followed through on its stated intention, terminating Connolly's

employment and benefits effective December 31, 2002.  Had this been the end of the matter,

Mills would be correct that September 2002 would be the critical date for statute of limitation

purposes.  Yet, this was far from the end of the matter.  As it turns out, Connolly was fully

reinstated as a Mills employee retroactive to December 31, 2002.  In effect, then, Mills retracted

and indeed nullified its prior decision to terminate Connolly.  This reversal is significant, because

it rendered Mills' September 2002 termination notice ineffective to trigger the running of the 300

---

[5]*See also Lewis v. Aetna Life Ins. Co.*, 993 F.Supp. 382, 386 (E.D. Va. 1998) (adverse
employment action must be "clearly and unequivocally obvious" to the employee).

day limitation period.

Yet this also does not end the analysis with respect to the September 2002 termination notice because when Mills reinstated Connolly in January 2003, it informed him that he could continue as an employee only until his consulting contract was finalized, although no final date was set for this to occur. Thus, Mills argues that the September 2002 termination notification remained in effect, as Connolly was still on notice that he would be terminated once his consulting agreement was in place. Alternatively, Mills argues that this January 2003 notice was a new final and unequivocal notice of termination. Neither argument is persuasive.

As an initial matter, the event on which Mills predicated Connolly's termination—the completion of Connolly's consulting contract—never occurred. Nor can it be said that the deadlines set for completion of the consulting agreement—the triggering event for the termination—were either firm or final. To the contrary, the deadlines changed over time and were never met, and moreover, Connolly was told that they were "not magic" and not to worry about them. And, it appears Connolly was justified in not doing so, given that he continued to work as an employee, receiving full benefits, bonuses, and salary increases. In these circumstances, Connolly might reasonably consider that his termination at some time in the future might or might not ever come about; in the indefinite intervening time circumstances might well change causing Mills to reconsider its decision to terminate him. Indeed, precisely this almost occurred some months later.[6] In these circumstances, the January 2003 termination notice provided to Connolly were far from either final or unequivocal.

_____

[6]*See infra*, Part I (stating that Fitzgerald told Connolly in August 2003 that he would probably remain a Mills employee for at least two more years).

8

In any event, even assuming, without deciding, that the January 2003 notice of termination was final and unequivocal, and that it would have triggered the limitation period, it was superseded by the August 2003 notice, which was itself plainly neither final nor unequivocal.  In August 2003, Fitzgerald told Connolly that Connolly "would probably keep working (as an employee) until there was no more work available."  This statement is ambiguous in two respects.  First, the modifier "probably" indicates that Mills likely—but not necessarily—would permit Connolly to continue as an employee for some period of time.  Second, the statement is also ambiguous in that it gives no indication of how long it would be "until there was no more work available".  Certainly one possible interpretation of this phrase is that Connolly would remain employed as long as there was work to be done at Mills.  Construed in this manner, Connolly might reasonably expect his employment to continue to the present, given that Mills continues to work on new projects even today.  Under this interpretation, then, Connolly's claim would not have accrued until November 15, 2005, his last day of employment at Mills.

To be sure, the phrase "until there was no more work available" might also be construed to mean that Mills intended to terminate Connolly once work ended on the projects on which he was then currently working.  Yet, this interpretation is arguably foreclosed by the December 2003 conversation between Fitzgerald and Connolly indicating that Mills did not intend to terminate Connolly once his then-pending projects ended, but rather that Connolly could keep working as an employee on projects that were currently "in the pipeline," which Fitzgerald predicted would keep Connolly busy "for at least the next two years."  Taken together then, the August and December 2003 conversations suggest that Connolly would remain a Mills employee

9

indefinitely, in which case the August 2003 termination notice would not qualify as final and unequivocal. *See English*, 858 F.2d at 961. In any event, the pertinent fact here is that Fitzgerald's August 2003 statement is open to a myriad of conflicting interpretations, and hence was not unequivocal. Accordingly, all three termination notices proffered by Mills fail, individually and collectively, to constitute final and unequivocal notice of termination sufficient to trigger running the limitations period.

It is important to note that Mills retained Connolly as an employee for more than three years after the time at which Mills initially told Connolly that he would be terminated. Research discloses no case in which an employer delayed implementing a final and unequivocal employment decision for such a lengthy period of time. The absence of authority in this regard is unsurprising, as most employers act with greater alacrity once they have decided, finally and unequivocally, to terminate an employee. The fact that Mills did not do so for such an extended period of time arguably invites the inference that Mills never made a final and unequivocal decision to terminate Connolly until it did so in November 2005.

None of the cases on which Mills relies involving termination decisions with delayed consequences is precisely on point. The closest case is *English v. Whitfield*, 858 F.2d 957 (4th Cir. 1988). There, a nuclear safety worker was notified that she would be laid off but was given a 90-day grace period in which to find other employment within the company. Holding that the statute of limitations began to run immediately rather than at the end of the grace period, the Fourth Circuit stated that:

> The notice of the challenged employment decision itself was in form final and
> unequivocal. There was no intimation in it that the decision was subject to further

10

appeal, review, or revocation, either in whole or in part.  *Id.* at 861.[7]

Mills argues that like English, Connolly received definitive notice that he would be terminated, except the event that would trigger his termination would be the execution of his consulting agreement rather than the end of a grace period.  Given that there was no specific date on which Mills and Connolly expected to consummate their consulting agreement, Mills appropriately concedes that—unlike the plaintiff in *English* who was slated for termination at the end of a 90-day grace period—Connolly could not have known precisely how long he would remain an employee.

While it is true that a termination notice may qualify as final and unequivocal even if termination is contingent on a future event, this may not always be so because not all future contingencies are equal in this respect.  To begin with, notice of termination contingent on some future event that may or may not occur at some indefinite point in the future cannot qualify because of the uncertainty regarding whether the employee will actually be terminated; intervening events might well lead to a reversal of the termination decision.  The *English* opinion recognized this result.  *See id.* at 961 (suggesting that notice of termination not final and unequivocal where employer "state[s] or impl[ies] that [employee's] temporary assignment might be lengthened or made indefinite in duration").  An example of this is an employer who notifies some employee that he will be terminated "when work runs out," or after some event occurs that may never come about.  This is hardly final and unequivocal notice.  Moreover, even where

---

[7]*See also Delaware State College v. Ricks*, 449 U.S. 250, 261-62 (1980) (holding that employer's decision to deny teacher tenure was not rendered tentative by existence of formal grievance proceedings to challenge denial of tenure).

notice of termination is final and unequivocal, it does not start the limitation period where the

employer is in a position to manipulate the event that triggers the termination, and thereby string

the employee along until the limitation period has run.  More specifically, an employer should

not be entitled to give the employee notice of termination and then structure the termination in

such a way that effectively forces the employee to relinquish his claim of discrimination by

providing the employee, as Mills did here, with a strong incentive to delay filing the claim.  Here,

from January 2003 on, Connolly was engaged in ongoing negotiations with Mills over his

consulting contract.  Surely, Connolly knew that Mills would be unlikely to consummate the

consulting agreement with an employee who filed a discrimination claim against the company.

In effect, then, unlike the employee in *English*, Connolly faced a Hobson's choice: He could file

a discrimination claim and thereby likely scuttle the consulting agreement, or he could wait and

hope the agreement might be completed and signed before the expiration of the limitation period.

The employee in *English*, by contrast, faced no such Hobson's choice; she merely had to wait the

ninety days and if no other company employment developed, there would still be ample time to

file a discrimination claim.

      While *English* makes clear that an employer may succeed in giving an employee final and

unequivocal notice that termination will take place on a date in the relatively near future, it does

not resolve whether an employer's notice is final and unequivocal where the termination is

contingent on an uncertain future event.  Nor does it address whether an employer's notice of

termination is final and unequivocal where that notice is contingent on a specific date outside the

period for filing an administrative charge and the employee is provided with an incentive in the

interim not to file a discrimination claim.  In these important respects, then,—the indefiniteness

of the period before termination and the built-in disincentive to file a claim,—*English* is distinguishable from this case.  Accordingly, none of the cases Mills cites compels the conclusion that any of the notices at issue qualify as final and unequivocal.

### III.

Alternatively, even assuming *arguendo* that any or all of the statements in issue were construed as final and unequivocal notice of termination, Connolly correctly argued that Mills is equitably estopped from relying on these notices to claim that Connolly's administrative charge was untimely.

In this regard, the Fourth Circuit has made clear that filing a timely charge of age discrimination with the EEOC is not a jurisdictional prerequisite for filing a judicial claim, but is instead subject to equitable considerations.  *See English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987) (limitations period for filing administrative charge of age discrimination not jurisdictional).[8]  Equitable estoppel "applies where, despite the plaintiff's knowledge of the facts, the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline." *See id.* at 1049.[9]  Thus, equitable estoppel will operate to toll the statute of limitation where the employee's failure to file in timely fashion results from (i) a deliberate design by the

---

[8]*See also Price v. Litton Business Systems, Inc.*, 694 F.2d 963, 965 (4th Cir. 1982) (same).

[9]*See also Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 232-33 (1959) (equitable estoppel available so that "no man may take advantage of his own wrong"); *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir. 1987) (equitable tolling is based "primarily on the view that a defendant should not be permitted to escape liability by engaging in misconduct that prevents the plaintiff from filing his or her claim on time").

employer or (ii) actions that the employer should unmistakably have understood would cause the employee to delay filing his charge.  *See id.*[10]

Mills' conduct here falls within the latter category.   Even assuming Mills had in fact decided to terminate Connolly years in advance, Mills was less than straightforward in communicating this decision to Connolly.   To the contrary, Mills sent Connolly conflicting messages regarding his future at Mills.   In this regard, Mills first informed Connolly in September 2002 that his employment would be terminated at the end of that year, and that he would continue thereafter as a consultant.   In November and December 2002, Connolly corresponded with Mike Rodis in an effort to finalize his consulting contract.   When no agreement was in place by late December, Connolly expressed his concern to Rodis.   According to Connolly, Rodis responded nonchalantly, and reassured him that his upcoming termination date was flexible.   As Connolly later learned, however, Rodis was wrong in this respect and Connolly was in fact terminated effective December 31, 2002.   When Connolly protested, Mills retroactively reinstated his employment status and benefits.   In the months that followed, Connolly continued to work as an employee, earning bonuses, salary increases, and praise. During this time, Connolly repeatedly contacted Rodis to finalize the consulting agreement, but

---

[10]Although related in purpose, the doctrines of equitable estoppel and equitable tolling are distinct.  In the employment discrimination context, equitable tolling is appropriate when the employer has wrongly misled the employee, and the employee reasonably relied on this misrepresentation by neglecting to file a timely charge.  By contrast, equitable estoppel does not necessarily require that the employer actually intend to deceive the employee; rather, it is sufficient that the employer "should unmistakably have understood [that its actions] would cause the employee to delay filing his charge."  *See, e.g.*, *Talbot v. Mobil Corp.*, 46 F.Supp.2d 468, 472-73 (E.D. Va. 1999) (contrasting equitable tolling and equitable estoppel).  Because Connolly has not alleged that Mills intended to deceive him, equitable estoppel is the more appropriate remedy.

14

Rodis put him off each time.  When Connolly informed Fitzgerald in August 2003 that his consulting agreement had not been finalized, Fitzgerald reassured him that Mills had ample work to keep Connolly working as an employee "probably for at least the next two years."  Mills should have understood that these events, taken together, would cause Connolly to conclude that Mills had reversed its earlier decision to terminate him, or was, at least, reconsidering or ambivalent about it.

Every objective indicium on which Connolly might have relied would have confirmed his conclusion in this respect.  For more than three years after telling Connolly that he would be terminated, Mills continued to employ Connolly on various important projects.  And throughout this period, Connolly continued to receive sterling performance evaluations and praise from the highest levels of Mills' management.  Nor were these sterling evaluations and praise empty words; rather, they were reflected in the performance bonuses and salary increases he received in April 2003 and April 2004, respectively.  From an economic standpoint, Mills' decision to keep Connolly actively engaged in projects as long as he was a salaried employee certainly makes sense; yet, it is less than obvious why Mills would continue to give performance reviews (and outstanding ones at that) and bonuses to an employee whose departure was supposedly imminent. Moreover, assuming Mills intended to adhere to its previously-stated intention to terminate Connolly as soon as a consulting agreement was finalized, it would be in Mills' interest to finalize this agreement as quickly as possible, thereby ending any obligation that Mills may have had to pay Connolly annual salary increases and performance bonuses.  Mills' apparent ambivalence in this regard, in combination with its decision to continue giving Connolly performance reviews, bonuses, and salary increases reasonably lulled Mills into believing that he

15

was not going to be terminated, or at least that any termination notices he received were no

longer either final or unequivocal.  Put simply and in more colloquial terms, this is a case where

"what you do makes so much noise, I can't hear what you say" about termination.

Significantly, were a contrary result to obtain in this case, an employer would be free to

tell an employee that he would be terminated at some uncertain date in the future, lavish praise

and performance bonuses on the employee until statute of limitations for filing an EEOC charge

had run, and only then to follow through on the earlier termination threat.  This is precisely the

sort of disingenuous or careless employer conduct that equitable estoppel is designed to prevent.

*See, e.g.*, *English v. Pabst*, 828 F.2d 1047, 1049 (4th Cir. 1987) (equitable estoppel prevents

party from taking advantage of its own wrong).  Accordingly, under the facts of this case, even if

Mills had given Connolly final and unequivocal notice of his November 2005 termination in

September 2002, January 2003, or even August 2003, Mills is equitably estopped from relying on

any of these notices to trigger the running of the statute of limitation.

For all these reasons, Mills' motion to dismiss Connolly's ADEA claim must be denied.

An appropriate Order will issue.

_____/s/_____

Alexandria, Virginia                                     T. S. Ellis, III
May 8, 2006                                              United States District Judge